UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DIANE M. NESBIT-FRANCIS,

              Plaintiff,

      -against-                       **MEMORANDUM & ORDER**

COMMISSIONER OF SOCIAL SECURITY,        Civil Action No. 15-1703

              Defendant.
--------------------------------------------------------X

**APPEARANCES:**

**OSTERHOUT DISABILITY LAW, LLC**
Attorneys for Plaintiff
521 Cedar Way, Suite 200
Oakmont, PA 15139
By:    Karl E. Osterhout, Esq.

**ROBERT L. CAPERS**
**UNITED STATES ATTORNEY, EASTERN DISTRICT OF NEW YORK**
Attorney for Defendant
271-A Cadman Plaza East
Brooklyn, New York 11201
By: Candace Scott Appleton, AUSA

**HURLEY, Senior District Judge:**

        Plaintiff Diane M. Nesbit-Francis ("Plaintiff") commenced this action pursuant to

42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social

Security (the "Commissioner" or "Defendant") which denied her claim for disability insurance

benefits and Supplemental Security Income. Presently before the Court are Plaintiff's motion and

defendant's cross-motion for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c). For the reason discussed below, Plaintiff's motion is denied and defendant's

cross-motion is granted.

# BACKGROUND

## I.      Procedural Background

Plaintiff applied for disability insurance benefits (DIB) on May 3, 2012, and  for Supplemental Security Income ("SIB") on May 16, 2012. (Transcript ("Tr.") 15.) Plaintiff alleges that since July 16, 2008, she has been disabled due to depression, and migraine headaches. (Tr. 19, 231.) She has been diagnosed with adjustment disorder, consisting of anxiety, depression, insomnia, anhedonia, and feelings of hopelessness. (Tr. 56, 348.)

Plaintiff's DIB and SSI claims were denied on August 1, 2012. (Tr. 15.) Subsequently, Plaintiff filed a request for a hearing, which was held on July 2, 2013 before administrative law judge ("ALJ") David Z. Nisnewitz. (Tr. 15, 29-72.) Plaintiff waived her right to a lawyer. (Tr. 30-31.) Plaintiff, together with psychological expert, Dr. Sharon Grand, Ph.D. (Tr. 55-59, 64-67, 70-71), and vocational expert, Peter Mansey (Tr. 60-64) testified. This hearing was adjourned to obtain additional medical records from Dr. Ana Romeo, an internist and Plaintiff's primary care physician. (Tr. 71.) A second hearing was held on September 10, 2014, during which Plaintiff was represented by attorney Gabrielle Muller. (Tr. 74-132.) Plaintiff and psychological expert, Dr. Sharon Grand, testified again at the second hearing. However, a different vocational expert, Stephen Davis, testified. (Tr. 102-32.) On October 9, 2014, the ALJ determined that Plaintiff was not disabled. (Tr. 15-22.) Review by the Appeals Council was requested. (Tr. 6-9.) The Appeals Council reviewed the ALJ's decision in accordance with the terms of the Settlement Agreement in *Padro v. Astrue*, 11-CV-1788 (CBA)(RLM) and on January 27, 2015 denied the request for review. (Tr. 1-5, 10-14.) This action followed.

## II. Factual Background

### A. Non-Medical Evidence

Plaintiff was born on September 16, 1956 and holds a bachelor's degree in human resources. (Tr. 32-33.) She has two adult children and one grandchild. (Tr. 35.) From 1991 to 1994, Plaintiff "volunteered" as a library liaison, although it was a paid position. (Tr. 38, 287.) From 1994 to 2000, Plaintiff worked as a community worker at a housing complex in the Bronx where her duties included managing client files, conducting fund-raising efforts, and completing internal reports. (Tr. 286.) This position entailed supervisory, budgeting, training, and client management skills. (Tr. 61, 286.) From 2000 until 2008, the Plaintiff worked as a program director for a rental assistance program helping clients who lived in transitional housing to locate permanent housing. (Tr. 37, 286.) In this role, she supervised three other people and was responsible for hiring and firing workers. (Tr. 286.) In addition to conventional desk work and paper work, Plaintiff would conduct home inspections and organize meetings. (Tr. 109.) She was let go from this position due to interpersonal conflicts with her supervisor. (Tr. 39-40, 44, 57, 83-84.)

In 2012, Plaintiff began working at Pomonok Senior Center for four to five hours a day, three days a week. (Tr. 40-42.) Although she refers to this as "volunteer work," she was compensated $230.00 every two weeks. (Tr. 40, 62.) By the time of the second hearing in 2014, Plaintiff was working two hours a day, two days a week. (Tr. 80.) She cited "too much stress" as the reason for reducing her time. (Tr. 81.) She was compensated $80.00 every two weeks for this activity. (Tr. 88.)

Plaintiff lives alone in an apartment, and she takes care of herself on a daily basis.

(Tr. 291-301.) She has no difficulty dressing, bathing, using the bathroom, feeding herself, or maintaining her appearance. (Tr. 292-93.) She prepares her own meals on a daily basis. (Tr. 293.) She cleans her own home, vacuums, does laundry, and shops for herself. (Tr. 43, 53, 294.) She goes outside three times a week. (Tr. 43, 294.) She can walk, use public transportation and drive a car. (Tr. 53-54, 294.) Her hobbies include reading and writing. (Tr. 295.) She has friends she talks to and meets regularly. (Tr. 54.) She attends church every week. (Tr. 43, 296.)

In addition to depression and anxiety, Plaintiff testified that frequent migraine headaches prevent her from seeking and holding employment. (Tr. 44-45, 291.) These headaches are comorbid with her clinical diagnoses of depression and adjustment disorder. (Tr. 56, 348.) Together these reported impairments limit her ability to manage stress and to concentrate. (Tr. 314.) Her psychological condition, in part, stems from a history of domestic violence at the hands of her deceased husband. (Tr. 34-35, 82.) Plaintiff was hospitalized for a nervous breakdown in 1988, after her husband physically abused her and "almost killed" her. (Tr. 34-36, 99, 312.) In 1999, she was admitted to the emergency room at North Shore Hospital for a severe headache after reportedly losing consciousness. (Tr. 67-68, 312.)  She testified that she experiences headaches two to three times per week and that they last for hours. (Tr. 45-46.) Sometimes a headache "knocks [her] down" and keeps her in bed although she could not say how often that happened. (*Id.*)

At the continued hearing, Plaintiff stated she was taking medication for hypertension. Her left foot was swollen, limiting her ability to walk. (Tr. at 77.) She cut back her hours at the senior center because it was too stressful; she would get headaches and start "thinking about things that had happened in the past," including the abuse by her now deceased

husband. (Tr. 80-82, 87-88, 99.)

In her disability report, she indicated that she does not have any limitations associated with lifting, standing, walking, sitting, using stairs, kneeling, squatting, reaching, using her hands, seeing, hearing, or talking; she can follow spoken instructions, and written instructions, but that she did have trouble remembering things. (Tr. 296-99.)

Peter Mansey, a vocational expert testified at the July 2, 2013 hearing. Based on the testimony of the psychological expert, Dr. Grant (*see infra*), he opined that Plaintiff could not do "her past relevant work because it was a skilled level." Specifically, her prior work as "an administrator, social welfare" is "sedentary with a SVP of 8" and her work as a community trainer is "light with an SVP of 6."  Mr. Mansey stated he "would reduce her skill level to semi-skilled, and also jobs that did not have . . . high pressure, or production quotas." (Tr. at 60-61.) He testified that a number of jobs exist in the national economy that meet the criteria of moderately complex and low stress, including information clerk, receptionist, and calculating machine operator. (Tr. 62-64.)

A different vocational expert, Stephen Davis, testified at the September hearing. After summarizing the testimony of Mr. Mansey, the ALJ asked Davis if assuming she could do light work, would she be able to perform any of her prior jobs. He responded, "[L]et me tell you what I came up with first because my jobs are a little bit different." (Tr. at 107.) Davis categorized her prior work  of "program director, case management" as "095.137-101, SVP 7" which is light, skilled and sedentary" and her "community worker" as "195.367-018, SVP 6, skilled, classified as light." (Tr. at 107.) He opined that with residual functional capacity to do light or sedentary work, "she can definitely do the community worker" and "probably couldn't

do" her past job as program director. (Tr. at 125.) He further testified that there are other jobs that

she could perform for which there exist jobs and to which her skills are transferrable. (Tr. 125-

127.) When questioned further as to why he ruled out program director he replied he relied on the

"doctor's testimony . . . that she was not performing at – well below a college level person or

what would be expected of a college level person." When the psychological expert confirmed

that there was nothing in the record to justify the referenced statement, Davis replied that "if

that's the case, then she could do the program director job" given a RFC of moderately complex

work that is moderately stressful. (Tr. 128-30.)

**B.  Medical Evidence - Treating Sources**[1]

    1.  <u>Dr. Ana Romeo</u>

        Plaintiff's primary care physician is Dr. Ana Romeo, an internist.  From April to

June 2008, Dr. Romeo reported that her physical examination of Plaintiff - including

neurological and spinal - were largely unremarkable. Plaintiff's  weight was 247 and her blood

pressure readings was 126/70 in June; her prior blood pressure readings in April and May were

130/70 and 126/82, respectively. Her electrocardiogram ("ECG") was normal and her cholesterol

was high. Dr. Romeo diagnosed obesity and dyslipidemia. (Tr. 492, 505-09.)

        In August 2008, Plaintiff complained of heart palpitations and dizziness. She

weighed 250 pounds, her blood pressure was 130/70 and her ECG was normal. (TR. 510.) In

February and March 2009, Dr. Romeo noted that Plaintiff's dyslipidemia and hypertension were

---

[1] The record contains medical documents relating to Plaintiff's treatment for a cyst, uterine fibroids and testing to screen for diseases with negative results. (*See* Tr. 369-407, 491, 498-99,500-02, 509). As these documents are unrelated to the impairments at issue, their contents are not be set forth herein.

controlled; she exhibited swelling in both legs and her blood pressure was 140/90 and 145/90 respectively. (Tr. 511-12.)  In June 2009, Plaintiff's ECG was normal, her blood pressure 155/90 and her weight was 255. (Tr. 514.)

According the record, Plaintiff did not see Dr. Romeo again until May 14, 2012. At that time, she weighed 264 and her blood pressure was 140/90. She was well kept and the physical examination finding were unremarkable. There were no motor or sensory deficits, no edema in the extremities and the neurological examination was normal.  Laboratory results showed higher than normal cholesterol levels and an ECG revealed non-specific inferior abnormalities. Dr. Romeo diagnosed borderline blood pressure with no history of hypertension; obesity and a history of dyslipidemia. (Tr. 473-89.)

On July 30, 2012, Plaintiff was seen by Dr. Romeo complaining of swelling in her ankles for a few days. She weighed 264 pounds and her blood pressure was 150/90. On examination, she appeared well kept, had normal affect and was fully orientated. Physical examination findings were unremarkable except for minimal non-pitting edema in the ankles with good distal pulses. There were no motor or sensory deficits. Dr Romeo diagnosed unspecified essential hypertension and mixed hyperlipidemia and recommended a low cholesterol diet, increased physical exercise for the mild ankle swelling, pressure stockings, and elevating the legs. She referred Plaintiff to a cardiologist and prescribed Avapro, Hydrochlorothiazide, Lipitor and aspirin for hypertension and lipid levels. (Tr. 474-75.)

Dr. Romeo saw Plaintiff again on September 10, 2012. Her blood pressure was 130/80 and her weight was 266 pounds. Physical examination was unremarkable and Plaintiff was fully orientated, appeared well kept and had a normal affect. (Tr. 476.) An electrocardiogram

conducted on September 22, 2012 revealed normal left ventricular function and wall motion, left ventricular filling pattern consistent with diastolic dysfunction, normal right ventricle with normal function, moderately dilated left atrium, normal right atrium, normal trileaflet aortic valve, mild to moderate mitral regurgitation, mild tricuspid regurgitation and physiologic pulmonic regurgitation. (Tr. 481.)

Plaintiff saw Dr. Romeo on February 3, 2013 and complained of chest pain without palpitations a few days earlier and right shoulder pain of several months duration. She weighed 258 pounds and her blood pressure was 120/70. Physical examination was unremarkable except for pain in the right shoulder with reduced abduction and the neurological examination was normal. There were no motor or sensory deficits and no edema in the extremities. Dr. Romeo diagnosed unspecified essential hypertension and mixed hyperlipidemia, noting Plaintiff's hypertension was better controlled but her cholesterol was poorly controlled. An ECG was normal except for a late transition. She opined that Plaintiff had a possible right shoulder sprain or frozen shoulder syndrome. (Tr. 477-79.)

Dr. Romeo completed a medical opinion questionnaire on August 29, 2014. She opined that Plaintiff would sit, stand, and/or walk for less than two hours in an eight hour day, could lift and carry less than ten pounds occasionally, required the ability to shift positions at will, needed to take unscheduled fifteen minute breaks every two hours, and needed to elevate her legs during prolonged sitting for up to 50% of the work day. Dr. Romeo indicated that Plaintiff had significant limitations in reaching, handling and fingering, could bend and twist 40 % of the day, could only occasionally twist, stoop, crouch, and climb, and needed "to avoid all environmental factors." She opined that Plaintiff would be absent from work more than twice a

month. (Tr. 515-17.)

### 2. New York Hospital

Plaintiff went to the emergency department of New York Hospital on October 31, 2012 complaining of an acute headache with some nausea. She reported that her previous headache had occurred two weeks earlier and rated her current pain as 3/10. Cardiovascular, neurological, psychological and musculosketal examinations were normal, as were a brain CT-scan and ECG. She was diagnosed with hypertension and migraine headaches. she received a morphine injection while at the hospital and was prescribed Acetaminophenoxycodone upon discharge. (Tr. at 439-64.)

### 3. Denise Granda-Gilbert, Ph.D., Clinical Psychologist

Dr. Granda-Gilbert completed a medical questionnaire on August 1, 2012 indicating that she treated Plaintiff from April 4, 2012 to May 16, 2012 and Plaintiff discontinued psychotherapy as she could not afford the co-pay and refused medication therapy. Dr. Granda-Gilbert listed her treating diagnoses as "309.28 - Adjustment Disorder with Mixed Emotional Features" with current symptoms consisting of anxiety, depression, insomnia, anhedonia and feelings of hopelessness, worthlessness and helplessness. She described Plaintiff's attitude and behavior as "anxious depressed, [and] exhibiting panic behavior," her speech, thought and perception as normal and her mood and affect as depressed and anxious. She further described Plaintiff's attention, concentration, and memory as disrupted due to depression, her insight as fair and her ability to perform calculations and serial sevens as average. In response to the inquiry as to Plaintiff's ability to function in a working setting, she wrote "P[atien]t would love to be employed!" She opined that based on her medical findings, Plaintiff "can work if

given a chance." Dr. Granda-Gilbert indicated that Plaintiff had no limitations for adaption, social interaction, understanding, and memory but her sustained concentration and persistence were "limited due to depression." (Tr 348-54.)

**C.    Medical Evidence - Non-Treating Sources**

    1.    <u>Iqbal Teli. M.D.</u>

        Dr. Iqbal Teli performed a consultative internal examination of Plaintiff on July 2, 2012. He noted that Plaintiff reported a history of headaches and hypertension of fifteen years duration, with headaches three times per week, associated with nausea and lasting a few hours. Plaintiff further reported that she lived alone, cooked, showered and dressed every day and that her activities included listening to the radio, reading and taking walks. On examination her weight was 263 and her blood pressure 160/86.  Her gait was normal, she needed no help changing for the examination or getting on and off the table, and rose from a seated position without difficulty. Plaintiff was able to squat 70% of the way down but was unable to walk on heels comfortably. Her heart and lungs were normal. Plaintiff had full ranges of motion of the cervical and lumbar spines, shoulders, elbows, forearms, wrists, hips, knees and ankles; there was full muscle strength throughout and no muscle atrophy. Deep tendon reflexes were physiologic and equal.  Hand and finger dexterity were intact and grip strength was full. Dr. Teli diagnosed a history of hypertension and chronic headaches. He opined that Plaintiff had no physical restrictions. (Tr. 308-11.)

    2.    <u>John Laurence Miller, Ph.D.</u>

        Dr. Miller, a psychologist, performed a consultative examination on July 2, 2012. He noted that Plaintiff reported she drove herself to the appointment, lived alone and had

completed her bachelor's degree. She told Dr. Miller she had lost her last job due to headaches and that she had been seeing a psychiatrist once a month for 23 years. She further stated that she was a victim of domestic violence and believed her mental health symptoms - weight gain and headaches - were due to that. Plaintiff described her depressive symptomatology as dysphoric moods, crying spells, feelings of hopelessness (since she stopped working), diminished self-esteem and concentration difficulties. She reported experiencing flash-backs of domestic abuse and having panic attacks, triggered by headaches, that occurred on an average of three times per week characterized by breathing difficulties, feeling as if a pin was sticking in a nerve and a need to lie down. She described having auditory hallucination in the past but not currently and current short term memory deficits. Her daily activities include dressing, bathing, cooking and preparing food, cleaning, laundry, shopping, managing money, taking public transportation as well as driving a car, socializing with friends and family, watching television, listening to the radio, reading and taking walks. (Tr. 313-14.)

On examination, Plaintiff appeared to be experiencing a severe headache. She was well-groomed and her social skills were satisfactory. Gait, posture, and motor behavior were normal. Speech was fluent and clear; thought processes coherent and goal-directed. Her affect was dysphoric and her mood dysthymic. Plaintiff's attention, concentration, and memory were impaired due to emotional distress. She was unable to perform a two step problem correctly and serial threes were completed to five. Cognitive function appeared below average for an individual with a college degree but her insight and judgment were good. Dr. Miller diagnosed major depressive disorder, moderate, and panic disorder without agoraphobia. He opined that Plaintiff would have trouble learning new tasks due to memory problems and did not appear able to deal

appropriately with stress. She could understand and follow simple directions, perform simple and complex tasks independently, maintain concentration, maintain a regular schedule, make appropriate decisions and relate adequately with others. (Tr 314-15.)

       3.      A. Herrick, Ph.D.

Dr. Herrick, a state agency psychological consultant, reviewed the record and competed a psychiatric review technique form and mental functional capacity assessment on July 31, 2012. He determined that Plaintiff had medically determinable impairments of an affective disorder and an anxiety-related disorder that did not meet the criteria of the Listing. He opined that Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no extended episodes of deterioration of extended duration; further, the record did not establish that Plaintiff satisfied the paragraph C criteria. He stated that there were no limitations in the following areas: ability to remember locations and work-like procedures; understand, remember and carry-out short, simple instructions; maintain attention and concentration for extended periods of time; maintain regular attendance; sustain an ordinary routine without special supervision; work in proximity to others; make simple work-related decisions; complete a normal workday without interruptions from psychologically-based symptoms; interact with the general public; ask simple questions to request assistance; get along with co-workers, use public transportation; and set realistic goals or make plans independently of others. He indicated that there were moderate limitations in the following areas: the ability to understand, remember and carry out detailed instructions; work with or in proximity to others without being distracted; accept instructions and criticism from supervisors; and respond appropriately to changes in the

work setting. Dr. Herrick opined that while Plaintiff might have difficulty adapting to stressful situations, she could understand and remember simple instructions, appropriately interact with others, maintain concentration and attention, maintain a regular work schedule, make appropriate decisions and perform complex tasks independently. (Tr. at 316-29, 336-39.)

    4.    <u>Larry Kravits, Psy. D.</u>

Dr. Kravitz, a State agency psychological consultant reviewed the updated medical record and completed a "Review of Psychiatric Review Technique Form" on August 23, 2012. He agreed with Dr. Herrick in the following areas: categories of disorders, rating of functional limitation and medical disposition. He indicated disagreement with "Listing 12.02C, 12.03Cor 12.04C in Remission" and "Listing 12.06C: without explanation. He stated in his summary, however, that "[w]hile claimant's presentation at the disability application interview was odd, in light of the much more comprehensive review by the CE, and the absence of any treatment records, it would be difficult to argue against the DDS severity assessment as unreasonable." (TR. 355-59.)

    5.    <u>James L. Greco, M.D.</u>

On August 20, 2012, Dr. Greco, a state agency medical consultant, reviewed the medical record and agreed with the conclusions of the consultative doctor, Dr. Teli, regarding the absence of exertional, postural, manipulative, visual, communicative and environmental limitations. (Tr. 360-61.)

    4.    <u>Dr. Sharon Grant, Ph.D.</u>

Dr. Grant, an Psychological Expert called by the ALJ, testified at both hearings. At the July hearing she was asked her opinion, based on the record, as to the nature of Plaintiff's

impairments, whether she meets or equals any listing and what her residual functional capacity is "from a mental point of view." (Tr. 55.) Dr. Grant referenced the report of Dr. Granda-Gilbert that indicated an adjustment disorder with mixed emotional features and "some symptoms of anxiety and depression, including insomnia, anhedonia, some feelings of hopelessness and worthlessness and some panic behaviors, and some memory difficulties due to depression." (Tr. 55-56.) She also referenced a "psych consult that indicates some memory difficulties[,] some difficulty dealing with stress [] [and] a major depressive disorder" but stated she "would tend to give greater weight to the treating psychologist's diagnosis." (Tr. at 56.) Dr. Grant opined that Plaintiff's "impairments would not meet or equal a listing but she would be limited to work that's routine, no more than moderately complex, and low-stress." (Tr. at 56.) Also, her headaches "shouldn't interfere with the psychiatric limitations" but "would be more of a physical complication." (Tr. at 65.)

At the September hearing, when Dr. Grant was asked if she still held the opinion that Plaintiff could do routine, moderately complex, low stress work, she replied, "I just want to take a quick look. Yeah, she – probably moderate stress work, your honor." (Tr. at 101.) The following colloquy then took place:

Q: Moderately?

A. Moderately stressful work, yeah.

Q. Moderately stressful, not low.

A. Yeah.

(Tr. 101.) When asked if he had any questions for Dr. Grant, Plaintiff's counsel responded she did not. (Tr. 101-102.)

**DISCUSSION**

I.      **Standard of Review**

    A.      **Review of the ALJ's Decision**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).  "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).  Thus the only issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

    B.      **Eligibility for Disability Benefits**

        1.      *The Five-Step Analysis of Disability Claims*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a

claimant

must establish that she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of

such severity that [the claimant] is not only unable to do [her] previous work but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for

evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure

as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If [s]he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits [her] physical or mental
> ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider [her] disabled
> without considering vocational factors such as age, education, and
> work experience . . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, [s]he has the residual functional capacity to
> perform [her] past work. Finally, if the claimant is unable to
> perform [her] past work, the [Commissioner] then determines
> whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per

curiam)). The claimant bears the burden of proof at steps one through four, while the burden

shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

2.    *The "Special Technique" for Evaluation of Mental Impairments*

The SSA "has promulgated additional regulations governing the evaluation . . . of the severity of mental impairments," that should be applied "at the second and third steps of the five-step framework . . . ." *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008). This "special technique" requires "the reviewing authority to determine first whether the claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id*. (internal citations omitted); *see also* 20 C.F.R. § 404.1520a(b), (c).  "[I]f the degree of limitation in each of the first three areas is rated 'mild or better, and no episodes of decompensation are identified . . . the reviewing authority . . . will conclude that the claimant's mental impairment is not severe' and will deny benefits." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(1)). However, if claimant's mental impairment or combination of impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the reviewing authority must "first compare the relevant medical findings [along with] the functional limitation rating to the criteria of listed mental disorders." *Id*. (citing § 404.1520a(d)(2)). If the mental impairment is equally severe to a listed mental disorder, the "claimant will be found to be disabled." *Id*. "If not, the reviewing authority [must then] assess" plaintiff's RFC. *Id*. (citing 20 C.F.R. § 404.1520a(d)(3)).

### C.     The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79.  The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts."  *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion.  *Id*. § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32.  Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so.  20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence."  *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also*

*Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)), amended on other grounds on rehearing, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled." 20 C.F.R. §§ 404.1512(e), (e)(1). The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source." Id. § 404.1512(e)(1). The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." Id. § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the

Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id*. § 404.1512(f).

## II.      The ALJ's Decision

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of July 16, 2008. (Tr. 17.) Proceeding to step two, the ALJ determined that Plaintiff has the following severe impairment: hypertension, obesity and an adjustment disorder with mixed emotional features. *Id*. At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.) The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work, except that she was limited to work that was only moderately complex, involved no more than moderate amounts of stress, and she must avoid highly complex work or work involving high levels of stress. (Tr. 19.) Relying on the testimony of the vocational expert, Mr. Davis, the ALJ found at step four that Plaintiff could perform her past relevant work as a community worker as it is "generally performed." (Tr. 22.) Accordingly Plaintiff was found not disabled under the Act.

## III.      Summary of Arguments

Plaintiff raises several arguments in support of remand. (Pl.'s Mem. at 3.) First, the ALJ failed to resolve conflicts in the record regarding vocational and psychological testimony. Specifically, it is asserted that he did not inquire of the vocational experts whether their testimony was consistent with the Dictionary of Occupational Title; he did not discuss the conflict between the testimony of the two vocational experts as to whether the RFC prevented

past work; he did not discuss the medical expert's change in testimony from the first hearing to the second; and he did not discuss the conflict between his assignment of considerable weight to the opinions of the consultative psychological examiner and Agency psychological consultants and their assessment of Plaintiff's work-related mental limitations. (*Id.* at 4-11.) Second, the ALJ's finding that Plaintiff can return to past work is contrary to law and not supported by substantial evidence. (*Id.* at 12-14.) Third, the ALJ's alternate step 5 finding that Plaintiff could perform other work is contrary to law and not supported by substantial evidence. (*Id.* at 14-17.)

Defendant asserts that the Commissioner's decision is supported by substantial evidence and is based upon the correct legal standard in that the ALJ properly weighed and evaluated the medical opinion evidence and the ALJ's step four finding was correct and his reliance on the testimony of the vocational expert was proper. Finally, Defendant argues that, notwithstanding Plaintiff's assertions to the contrary, the ALJ did not make a finding at step five.

## IV.    Application of the Governing Law to the Present Facts

After a careful review of the record in this case, the Court concludes that the ALJ's  conclusions are supported by substantial evidence and he applied the correct legal standards.

## A.    Alleged Conflicts with the DOT

Plaintiff claims that the ALJ has an affirmative duty to inquire of a vocational expert whether or not his testimony conflicts with information contained in the DOT and the failure of the ALJ to make such an inquiry is an error requiring remand. Plaintiff relies upon the following language contained in Policy Interpretation Ruling of the Social Security Regulation

00-4P. Policy Interpretation Ruling : Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, and Other Reliable Occupational Info. in Disability Decisions, SSR 00-4P (S.S.A. Dec. 4, 2000): "At the hearing level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire on the record, as to whether or not there is such consistency." (Pl.'s Mem. at 4 (citing SSR 00-4P).) However, Plaintiff's argument ignores the sentence which immediately precedes the relied upon portion of SSR 00-4P. That sentence provides: "When there is an apparent unresolved conflict between the VE or VS evidence and the DOT, the adjudicator must a elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled."  SSR 00-4P.  In accordance with this language, SSR 004-P requires an ALJ to address only apparent conflicts between a vocational expert's testimony and the DOT, not all possible conflicts. *See Daragjati v. Colvin*, 2015 WL 427944, * 8 (E.D.N.Y. Jan. 31, 2015) (remanding case as ALJ did not inquire into apparent conflict between VE's testimony and the DOT); *see generally Jasinski v. Barnhart*, 341 F.3d 182, 185 (rejecting claim that ALJ should have inquired into the conflict between the testimony of the VE and the DOT as there is no actual conflict if the differences between the sources reflects the difference between the "expert's description of the job that the claimant actually performed, and the Dictionary's description of the job as it is performed in the national economy"). Here, Plaintiff fails to identify any apparent or actual conflict between the testimony offered by either vocational expert and the information contained in the DOT.[2] In the absence of such conflict, the duty to inquire does not arise.

---

[2] The Court also notes that Plaintiff does not challenge the VE's categorization or description of Plaintiff's jobs.

**B.     Alleged Conflicts in the Vocational Experts' Testimonies**

Next, Plaintiff contends that the ALJ did not resolve the alleged inconsistency between Mr. Mansey's testimony and Mr. Davis's testimony. Plaintiff argues that failure to resolve such a conflict in the record amounts to a reversible error.

In fact, there is no such discrepancy. Each expert was responding to the RFC assessment hypothetical presented. Mr. Mansey offered his opinion based on a hypothetical individual capable of work that is routine, no more than moderately complex, and low stress. (Tr. 55-56,60-64.) But this was not the hypothetical RFC presented to Mr. Davis (and ultimately found by the ALJ). The testimony of Mr. Davis at the second hearing was based upon an individual who could perform moderately complex work that was moderately stressful. (Tr. 130) Simply put, there is no unresolved conflict requiring remand.

**C.     The Failure to Discuss the Medical Expert's Change in Testimony**

Without citation to any authority, Plaintiff asserts that remand is required because the ALJ did not elicit any explanation from Dr. Grant as to the reason for the change in her testimony from the first hearing to the second. Dr. Grant testified at the first hearing that Plaintiff's mental impairments would limit her to work that was routine, no more than moderately complex and low stress. At the second hearing, after checking her notes, she testified that the limitation should be moderate stress - not low, and later stated she did not mean to say routine.

While it might have been preferable for the ALJ or Plaintiff's then counsel to have inquired of Dr. Grant to explain the change, their failure to do so does not require remand because, as discussed *infra,* the ALJ's RFC determination is supported by substantial evidence in

the record. *See Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (stating that harmless error may not necessitate remand to the agency)*; cf. Suttles v. Colvin*, 654 Fed. Appx. 44, 47 (2d Cir. 2016) (failure to consider new evidence was harmless error because "there was no reasonable possibility that the consideration of [the new evidence] would have altered the ALJ's decision."); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (explaining that ALJ's failure to consider even a treating physician's report could be harmless error if there was "no reasonable likelihood" that considering it would have changed the disability determination"); *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 29, 34 (2d Cir. 2013) (affirming ALJ's RFC determination based on extensive medical record despite the fact that the record did not include formal opinions as to claimant's RFC); 20 C.F.R. § 1527(d)(2) ("Although we consider opinions from medical sources on issues such ... [as a claimant's] residual functional capacity ... the final responsibility for deciding [this] issue[ ] is reserved to the Commissioner.").

**D.**   **Failure to Discuss the Conflict between the Assignment of Considerable Weight to the Opinions of the Psychological Professionals and Their Assessment of Plaintiff's Work-Related Mental Limitations**

Plaintiff asserts that the ALJ committed error when he assigned "considerable weight" to the opinions of the consultative psychological examiner (Dr. Miller), the psychiatric consultant (Dr. Kravitz) and Plaintiff's treating psychologist (Dr. Granda-Gilbert) but failed to resolve conflicts between the opinions of those medical professionals and his RFC. For example, Plaintiff contends that the limitations identified by Dr. Kravitz suggest that Plaintiff could only understand and remember simple instructions. Similarly, it is argued that Dr. Granda-Gilbert stated the Plaintiff's attention, concentration, and memory were disrupted due to depression resulting in a limited ability to sustain concentration and persistence. By contrast, the RFC

adopted by the ALJ would require Plaintiff to perform moderately complex work. Based on findings such as these, Plaintiff's counsel argues that the ALJ's determination was not supported by substantial evidence. (Pl.'s Mem. at 9-11.)

Prior to reaching his conclusion as to Plaintiff's RFC, the ALJ carefully reviewed the evidence before him. Addressing first Plaintiff's physical impairments,[3] the ALJ noted that the medical records document ankle swelling only in February 2009 and July 2012, with the exams in 2008 and May 2012 indicating no lower extremity edema. (Tr. at 19.) Further, while the record indicates instance of shortness of breath, cardiac testing was unremarkable except for mild to moderate regurgitation. With respect to her headaches, the record showed one visit to the emergency room in October 2012 with the CT scan taken being unremarkable. Noting the disparity between Dr. Romeo's opinion that Plaintiff was limited to sitting, standing, and walking less than two hours in an eight day hour, and that of the consultative examiner, Dr. Teli, that she had no limitations, the ALJ found that Plaintiff's physical ailments, including her obesity, would "preclude heavy levels of exertion" but Plaintiff would be capable of "at least light work activity." As support for this conclusion, the ALJ noted the lack of support for Dr. Romeo's conclusions, including that Plaintiff had no lower extremity edema for most of the period at issue and that while her hypertension was uncontrolled at times, "any associated impairment would impose only moderate limitations." (Tr. at 20.) The ALJ also cited Plaintiff's own statements concerning her ability to drive, use public transportation, visit family and perform activities of daily living. (Tr. at 20-21.)

---

[3] Although Plaintiff does not argue any error with respect to the ALJ's determination of her physical impairments, the Court reviews that determination as part of its obligation to ensure the ALJ's decision is based on substantial evidence.

Addressing Plaintiff's psychiatric impairments, the ALJ began his analysis with Dr. Granda-Gilbert's assessment that Plaintiff had "some limitation with respect to sustained concentration, persistence, and pace but otherwise had no limitations" and that "given the chance [Plaintiff] would be able to work." (Tr. at 21.) He then discussed Dr. Miller finding, including that Plaintiff "has trouble learning new tasks due to memory problems and that she did not appear to deal appropriately with stress" but was "capable of following, understanding, and performing simple and complex tasks/instructions. maintaining attention and concentration, maintaining a regular schedule, making appropriate decision and relating adequately with others." (*Id.*) Finally, the ALJ noted Dr. Herrick's assessment that Plaintiff that Plaintiff "had moderate limitations with respect to maintaining concentration., persistence and pace, but otherwise only had mild limitations." (*Id.*)  The ALJ found these three opinion consistent to the extent they indicated no limitations other than in Plaintiff's ability to maintain sustained concentration, persistence, and pace and to deal with stress. But the ALJ "gave particular weight" to Dr. Miller's opinion that she cannot deal appropriately with stress. Based on these opinions and on Plaintiff's testimony regarding her activities, the ALJ concluded that Plaintiff "must avoid highly stressful work or work requiring highly or complex tasks" but would be capable of "moderately stressful and moderately complex work." (Tr. at 21.)

Here, the ALJ appropriately considered and weighed the medical evidence in reaching his RFC assessment. *See* 20 C.F.R. §§ 401.1527(d)(2) (while medical opinions on RFC are considered, the final decision as to this issue lies in the Commissioner); *Cage v. Comm'r Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("[W]e defer to the Commissioner's resolution of conflicting evidence."); *Matta v. Astrue*, 508 Fed. Appx. 53, 56 (2d Cir. 2013) ("Although the

ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding consistent with the record as a whole.") Besides the evidence discussed by the ALJ, there is other evidence in the record that supports his RFC. For example, Dr. Granda-Gilbert described Plaintiff's ability to perform calculation and serial sevens as average ( tr. at 351), and Dr. Miller opined that Plaintiff could perform complex tasks independently (tr. at 314). These opinions support the ALJ's conclusion that she can perform moderately complex work. (Tr. at 351.) The ALJ's determination that while Plaintiff must avoid highly stressful work but is capable of moderately stressful work is a synthesis of the opinions of Drs. Herrick and Miller that Plaintiff has difficulty with dealing with stress and Dr. Granda-Gilbert's which noted no such limitation. The ALJ was not required to state every reason justifying his decision, *see Brauly v. Social Security Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("an ALJ is not required to discuss every piece of evidence submitted [and] an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered") (internal quotation marks omitted) as his findings are supported by  substantial evidence.

**E.     The ALJ's Step Four Analysis**

To the extent that Plaintiff's asserts that the ALJ's finding that she can return to past relevant work is contrary to law, she simply a reiterates her previously rejected arguments regarding the "conflict" between the testimony of the two vocational experts, Dr. Grand's "changed" testimony, and the ALJ's "failure" to reconcile the inconsistency between his giving "considerable weight" to the opinions of the experts and "his finding which excluded their opinions that Plaintiff was limited to understanding, remembering, and carrying out only simple

routine tasks. (Pl.'s Mem. 12-14.) For the reasons previously, discussed, the Court rejects these arguments.

Plaintiff's assertion that the Step 4 analysis is not supported by substantial evidence, is also rejected. Because the ALJ's RFC finding is supported by substantial evidence, and his hypothetical question to Mr. Davis precisely matched the RFC finding, this vocational expert's testimony provides substantial evidence for the ALJ's step four conclusion. *Ohrnberger v. Colvin*, 2016 WL 4435222, * 10 (E.D.N.Y. Aug. 19, 2016).

F.    **The "Alternate Step Five Finding"**

Finally, Plaintiff's argument regarding the ALJ's "alternate step 5 finding" (Pl.'s Mem. at 14-17), is underwhelming. While the ALJ did elicit testimony from the vocational expert about other jobs besides past work that a hypothetical person with certain limitations could perform, his decision does not contain an alternate step five finding. *See* Tr. at 15-22.

In summary, the Court finds that the ALJ's findings were not based on legal error and are supported by substantial evidence.

## CONCLUSION

For the reasons set forth herein, Plaintiff's motion for judgment on the pleadings is denied and defendant's cross-motion for judgment on the pleadings is granted.  The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York                   s/  Denis R. Hurley
        February 14, 2017                    Denis R. Hurley
                                                 United States District Judge